IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:15-cr-0201-LO |
| EDWIN STUART LIVINGSTON III, | ) | |
| RONALD JOSEPH TIPA, | ) | Hearing: February 25, 2016 |
| THOMAS EDWARD TAYLOR, and | ) | |
| ROSS BERNARD DELBOIS, SR., | ) | |
| | ) | |
| Defendants. | ) | |

## OMNIBUS RESPONSE OF THE UNITED STATES TO DEFENDANTS' PRETRIAL MOTIONS

## TABLE OF CONTENTS

Introduction ....................................................................................................................... 1

I.      Defendants' motion to suppress the audio recording of the July 9, 2014
        MPSC board meeting (Dkt 75) should be denied. ................................................ 1

        A.      The recording of the July 9, 2014, MPSC board meeting. ......................... 2

        B.      The agents acted reasonably when recording discussions between
                the subject interceptees relevant to the conspiracy. .................................. 8

                1.      Legal standard. ............................................................................... 9

                2.      The FBI agents did not act unreasonably when recording
                        discussions that were pertinent and relevant to the
                        conspiracy. .................................................................................. 10

                3.      Suppression of the recording is not an appropriate remedy. .......... 16

        C.      The recording is not so unintelligible that it is untrustworthy or
                more prejudicial than probative. .............................................................. 17

        D.      An evidentiary hearing is not required. .................................................... 18

II.     DeBlois's motion for sanctions (Dkt 72) should be denied. ................................ 19

        A.      Factual background relating to the interview of DeBlois. ........................ 19

        B.      The government has fully complied with Fed. R.Crim. P.
                16(a)(1)(B). ............................................................................................... 21

III.    Livingston and Tipa's motion for severance (Dkt 63) should be denied. .............. 22

IV.     Defendants' motion to dismiss multiplicitous counts (Dkt 78) should be
        denied. ............................................................................................................... 26

        A.      In assessing a claim of multiplicity, the court applies the
                *Blockburger* test to the elements of the offenses at issue—not the
                actual conduct alleged in the indictment. ................................................. 27

        B.      A *Blockburger* analysis of the elements of § 201(b)(1) bribery and
                honest-services wire fraud confirms that each offense requires
                proof of an element that the other does not require. ................................. 28

        C.      *Skilling* does not make § 201(b)(1) bribery a lesser-included
                offense of honest-services wire fraud. ...................................................... 30

D.    A *Blockburger* analysis of the elements of § 371 conspiracy and § 1349 conspiracy confirms that each offense requires proof of an element that the other does not require. ...................................................32

E.    Where a defendant claims that an indictment is multiplicitous because it contains lesser- and greater-included offenses, pretrial dismissal is not the appropriate remedy. ..................................................33

V.    Defendants' motion to dismiss Counts 5, 6, and 8 (Dkt 69, 70) should be denied. ...........................................................................................................37

A.    Defendants' pretrial motion to dismiss Counts 5, 6, and 8 for lack of evidence is premature. ..........................................................................38

B.    Even if the wires at issue were sent after Porter cashed the checks, they were still "incident to" and "part of the execution of the scheme as conceived" by the defendants, and thus may be the basis for wire-fraud convictions. ...........................................................................40

C.    Because the bribes here involved a series of payments and the success of future payments depended on the successful wire transmissions, the wires transmissions were made with the purpose of executing an ongoing fraudulent venture. ...............................................42

VI.    Defendants' motion for a bill of particulars (Dkt 61) should be denied. ...............44

VII.    Defendants' motion to compel production of interview notes (Dkt 65) should be denied. .......................................................................................................53

VIII.    Defendants' motion to compel defendants' statements (Dkt 67) should be denied. ..........................................................................................................................55

IX.    Defendants' motion for discovery order (Dkt 74) should be granted in part and denied in part. ...........................................................................................56

Conclusion ..................................................................................................................................57

ii

## <u>INTRODUCTION</u>

The United States submits this consolidated Omnibus Response to defendants' numerous pretrial motions and memorandums and exhibits in support. (*See* Dkt 61–78.) As more fully discussed in each section below, defendants' motions should be denied in full.

**I.     Defendants' motion to suppress the audio recording of the July 9, 2014 MPSC board meeting (Dkt 75) should be denied.**

Failing to cite to a single case where a recording was suppressed, the Defendants have moved to suppress the key recording in this case on the allegation that the government failed to minimize appropriately. In their motion, defendants apply an inappropriately narrow analysis to argue that by listening to any conversation—except for specific discussions of the 1% bribe payment that defendants made to Robert Porter—FBI agents acted so unreasonably that they violated the law and that the only remedy is suppression of the entire recording. This argument ignores the fact that the government met its minimization requirement by seeking an extremely narrow wiretap for only *one* day, at *one* location, of *one* meeting, that included *only* the subject interceptees. Under these circumstances, the statute authorizing wiretaps, this Court's order, and Fourth Circuit precedent allow for the recording of a broader set of communications. Indeed, the only cases defendants cite involve weeks of interception, interception of innocent parties, and the interceptions of non-criminal conversations—and yet, suppression was not granted in any of them.

Defendants also attempt to argue that parts of the recording are so unintelligible that the entire recording is untrustworthy and too prejudicial to be admitted in whole or in part. However, once again, the recording and caselaw prove defendants' argument to be unavailing. The recording, which will be filed with the Clerk for the Court to review, demonstrates that the relevant section that the government will seek to introduce at trial can be understood—and that is

1

all the law requires in order for the recording to be admissible. (*See* Exhibit 1, to be provided to district court under seal, and previously produced to defendants in discovery (discussing the 1% bribe payment to Porter from 1:20:30 to 1:26:00).)[1]

### A.    The recording of the July 9, 2014, MPSC board meeting.

As evidenced by the Defendants' motion, the government took many proactive steps to ensure that it recorded the July 9, 2014 MPSC Board Meeting to fully meet its legal obligations. (*See* Dkt 76 at 4–10.)

On July 8, 2014, the government filed an application for an order authorizing the interception of oral and visual non-verbal communications, seeking to record MPSC's Board Meeting on July 9, 2014. (*See* Dkt 76, Ex. 1.) The government had probable cause—based on confidential informants, consensual body recordings, and other evidence—to believe that defendants and their then-co-conspirator John Jones would discuss a 1% bribe payment that had been promised to Porter for steering millions of dollars of Army National Guard contracts to the their company, MPSC. Although there was substantial evidence to prove that defendants were discussing the bribe payment and agreement with Porter throughout the months of June and July 2014—including consensual recordings where defendants referred to such conversations—the government did not seek to wiretap the telephones of each defendant or to request a 30-day authorization to wiretap the MPSC conference room. (*See* Dkt 76, Ex. 1, at 26 (quoting a June 25, 2014 consensual recording, "CI-2: It's about that deal with [LIVINGSTON] and [TIPA]. Did they . . . talk to you about that?, Deblois: Yeah."); 21 (quoting a consensual recording that took

---

[1] In a footnote, defendants seek to preserve their right to challenge, at a later date, any other recordings produced in this case on the basis that the government has produced over 26,000 audio recordings. However, the government produced what it considered to be the most relevant evidence in this case on July 17, 2015, two days after the Defendants were indicted. This production included 99 audio files, an amount that defendants have had ample time to review. Thus, defendants should not be allowed to preserve their right to move to suppress any recordings provided in the July 17, 2015 production.

place on June 3, 2014, "Tipa: I think tomorrow at the [Board of Directors] meeting, we say we made a deal on one percent for [CI-2], which we did.").) Instead, the government requested—and the Court approved—a narrow authorization to wiretap the MPSC conference room for a single day.

Despite defendants' representations to the contrary, on the application, the government requested authorization to record a broader set of communications related to the subject offenses of conspiracy to commit bribery and gratuities, bribery, and gratuities, not limited to the confirmation of the 1% bribe payment that defendants intended to make to Porter. Instead, the government sought to record all conversations relevant to defendants' conspiracy. The application indicated that these communications would include: "(i) the nature, extent and methods of the herein-described criminal activities of the [defendants] and others; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the illegal activities; (iii) the distribution and transfer of money involved in the illegal activities; and (iv) the existence of any records related to the illegal activities and the identity of any person(s) maintaining such records." (Dkt 76, Ex. 1, at 14.) The Court's order authorized—in identical language—the government to record all conversations relevant to defendants' broader conspiracy. (*See* Dkt 76, Ex. 4, at 2–3.)

In seeking authorization for the July 9, 2014 MPSC Board Meeting wiretap, the government agreed to comply with its legal obligations to minimize—i.e., stop recording where it is clear that conversations are not relevant to the conspiracy or are privileged, and spot check where appropriate. (*See* Dkt 76, Ex. 1, Ex. 2.) The government affirmed that the agents would immediately stop monitoring conversations "when it is determined that the conversation is *unrelated* to communications subject to interception . . . or if it is potentially subject to the

attorney-client privilege." (Dkt 76, Ex. 1, ¶ 13 (emphasis added).) Thus, if and when the agents could make a conclusive determination that the discussion was unrelated to defendants' over-10-year conspiracy to commit bribery and gratuities by obtaining millions of dollars of Army National Guard contracts, from multiple National Guard officials whom they paid bribe payments through MPSC's accounts, then the agents would stop recording. To clarify the requirement, the government stated that minimization efforts would be focused on "minimizing privileged communications and *personal* non-criminal conduct," communications that "did not *relate* to the investigation," or "*[did] not involve* the SUBJECT INTERCEPTEES [the Defendants and Jones] or other coconspirators." (Dkt 76, Ex. 2, ¶ 54a. (emphases added).)

In order to responsibly provide guidance for the FBI agents that would execute the one-day wiretap, the government attorneys provided a memo to the FBI agents, detailing—among other things—suggested minimization procedures and explanations of privileges. (*See* Dkt 76, Ex. 3 (a copy of the government's internal minimization memo that the government voluntarily provided to defense counsel).) The memo explained that the FBI agents could listen to communications "that concern the means by and the manner in which [the Defendants and Jones] conduct and participate in certain illegal activities . . . , as well as the identities, roles, and locations of other participants . . . , other locations used . . . , and the distribution and disposition of the contraband and monies used in and obtained through those activities [conspiracy, bribery, and gratuities]." (*Id.* ¶ 5.)

The MPSC Board of Directors met on July 9, 2014, and substantially all of the meeting was recorded. At the meeting, only the subject interceptees were present (defendants and Jones), they had the following discussion relating to the 1% bribe agreement with Porter:

DEBLOIS:           [Porter], now last meeting, um, um, [Porter] met with you guys about the incentive of fifty-five thousand dollars for his influence

4

on three contracts, and you guys came up with one way to figure it out from there. The three contracts are AMA; that's the motorcycle, Trademark, both of them are gone now, and the SRSC and that's one of the ones. Now, at the time when we got these, [Porter] was in uniform. How instrumental [Porter] was in this [UI]. These all went on the Marketing IDIQ that we had to compete for. They came off of—they went on the Support contract and came off the Marketing IDIQ [UI]. They came to us and we competed for it. They were awarded in September and October of 2011. [Porter] was in uniform that entire year of 2012. So I can't, there's no way I can verify it. If [Porter] says, you know, we owe [Porter] one percent and fifty-five thousand dollars is accurate. Um, so, the numbers add up. The one thing that I find interesting is that [Porter] waited so long. We thought [Porter] had [Porter's] money, but [Porter] asked me in 2012 [UI].

LIVINGSTON:    Well, let me, let me, part of that, um—I think I blew [Porter] off for about, about six months at least.

TIPA:    Yeah, Ross, me too, same thing.

LIVINGSTON:    So [Porter] asked probably six months or a year ago, you know I'd just blew [Porter] off.

DEBLOIS:    Well, I mean, that's, that's—

TIPA:    That's because I forgot—I basically forgot [UI].

DEBLOIS:    Now, now depending on this, depending on your decision on people- you know this may come [UI]—

TAYLOR:    The problem I have with that is you give bonuses to guys who we really don't know what kind of influence [Porter] had. I mean, if you look at [Guard Official A], he's not really [UI], but like when he had the big—he was in charge of the A-R, whatever it's called, A-R-C or whatever. By the time we got that contract, the big contract—[Guard Official A]'s—one of [Guard Official A]'s beef when he came here is, you know, he said well you know you guys wouldn't have got that contract without me. He would say that to me and I said, [Guard Official A] that's why you're here, we hired you because we like you and you've been supportive. But he said well you know, everyone gets bonuses. I ain't going to get quotas. If he had got a bonus [UI]...

TIPA:    But [MPSC Employee A] was getting [UI] for his fricken' money.

LIVINGSTON:    But [MPSC Employee A], paid him for that.

5

| | |
|---|---|
| TIPA: | [MPSC Employee A] paid him. Lucratively. |
| TAYLOR: | I don't know how lucratively. |
| LIVINGSTON: | He made it real well. Trust me, I saw the numbers every month. He got way more than one percent. Now back to, back to—let's talk about [Porter] again. That contract came up for re-compete under [Guard Official B] and [Guard Official B] wanted to kill it. [Porter] kept it alive for three more years. |
| TIPA: | Look, the fifty thousand, I got no— |
| LIVINGSTON: | Ron and I made an agreement. |
| TIPA: | If [Porter]—I did, I made an agreement with [Porter]. The deal was difficult, but it doesn't really matter, the agreement was, guys, we're going for the marketing contract, the marketing contract was going to be out there [UI] and we weren't going to put in for it. And I came in and I talked to Ross and said, Ross, let's put in for the Marketing contract, which we did. Okay? We took the marketing contract… |
| DEBLOIS: | Did away with it. |
| TIPA: | Did away with it and moved these contracts to the— |
| DEBLOIS: | [R&R] Support. |
| TIPA: | To the [R&R] Support one. That [Porter] was saying that he did it, so basically it was under direct [UI]. Do we prove it? Do we prove it or not? To me it's not worth the argument of proving it or not proving it. |
| LIVINGSTON: | And we'll discuss it in the— |
| TIPA: | Especially if [Porter's] on that hit list. I mean, I'd just assume give it to [Porter], seriously. |
| TAYLOR: | Severance pay kinda thing? |
| TIPA: | No. |
| LIVINGSTON: | I don't think it's severance pay, I think, I think, I think [UI] and then we have severance. |
| TIPA: | We can't prove it or disprove it. I don't like the fact that [he/she] came two years later either, that fucking guy, what are you making |

6

|            | this shit up as you go, you know what I mean? That pissed me off a little bit. |
| TAYLOR: | It seems really strange to me—I mean, I'll go with what the majority wants to do, but I got—that just doesn't sit—it just doesn't feel right. |
| TIPA: | To me—to me, it's not worth it. |
| TAYLOR: | It doesn't feel right. |
| DEBLOIS: | I met with [Porter] and I said, I got it [Porter]—with what the board decides [UI] it would probably be over a three month period. |
| TIPA: | Fine. |
| DEBLOIS: | About three months, we'll break it down. |
| TAYLOR: | [UI] |
| DEBLOIS: | I meet with these guys every day. |
| TAYLOR: | It doesn't make any sense to me. I don't care, whatever you guys want to do. |
| DEBLOIS: | If you insist on putting a lid on it. |
| TAYLOR: | You know, twenty-five thousand a month. |
| TIPA: | Well, I vote, I vote, I vote yes on it. |
| LIVINGSTON: | I vote yes. |

During this same meeting, they also discussed pending layoffs, which included Porter. As a part of the layoffs, defendants discussed giving everyone a severance package of being paid until September 30, 2014 without being expected to do any further work for MPSC. They discussed a dispute with another company that MPSC had originally used as an SBA 8(a) company to obtain National Guard contracts that could be awarded only to SBA 8(a) companies.

When intercepting the July 9, 2014 MPSC Board of Directors meeting, the FBI agents minimized and stopped listening to—and recording—the conversation twice at the start of the

meeting when the participants were discussing sports. (Dkt 76, Ex. 7.) After stopping the recording twice, when the FBI agents began listening once again for the third time, the discussion was about the agenda. For the next approximately three hours, the subject interceptees (defendants and Jones) discussed MPSC business. Then, at the end of the meeting, the discussion once again turned personal and the agents minimized three more times, each time stopping the recording because the interceptees were discussing being the victim of credit card fraud.

Defendants allege that the FBI agents did not stop the recording for 30 seconds where they determined that minimization was appropriate because the recording provided in discovery only stops for a couple of seconds. (Dkt 76 at 10 n.2.) However, defendants fail to recognize that when minimization occurs, recording stops. This is consistent with the government's legal obligations as the FBI agents are required to stop recording when they are not listening. Thus, the pauses in the actual video will not continue for 30 seconds, but instead, will stop momentarily and pick up where the recording was resumed.

On July 11, 2014, the government filed a report with the Court, reporting that the FBI agents had intercepted communications for approximately 3 hours out of the 20 hours that the Court had authorized interception. The government included that of the approximately 3 hours that were recorded 2 ½ minutes were deemed to be non-pertinent and minimized, and that 0 minutes were deemed to contain privileged communications. Thus, detailing for the Court that during the short window that the FBI agents were recording, a minimal amount was minimized.

**B.      The agents acted reasonably when recording discussions between the subject interceptees relevant to the conspiracy.**

Defendants seek to suppress the recording of the July 9, 2014 MPSC Board of Directors Meeting on the basis that the FBI agents who handled the interception acted so unreasonably that

they violated the law and suppression of the entire recording is the only remedy. This argument is not supported by Fourth Circuit precedent or the facts of this case.

### 1.   Legal standard.

The statute that authorizes the use of wiretaps, 18 U.S.C. § 2518(5), provides, in part, that: "No order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. . . . Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to *minimize the interception of communications not otherwise subject to interception* under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days." (emphasis added).

In determining whether the government has complied with the minimization requirement, courts proceed "on a case-by-case basis, invoking a standard of reasonableness." *United States v. Clerkley*, 556 F.2d 709, 716 (4th Cir. 1977) (citations omitted). The statute is satisfied "if 'on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *Id.* at 716 (citing *United States v. Armocida*, 515 F.2d 29, 42 (3d Cir. 1975)); *see also United States v. Oriakhi*, 57 F.3d 1290 (4th Cir. 1995) (same); *Scott v. United States*, 436 U.S. 128, 140 (1978) ("Blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer. While such percentages may provide assistance, there are cases, like this one, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable.").

In determining the government's reasonableness, courts consider "three principle factors: (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial

supervision while the wiretap order is being executed." *United States v. White*, 519 F. App'x 797, 801 (4th Cir. 2013) (quoting *Clerkley*, 556 F.2d at 716).

> ### 2.     The FBI agents did not act unreasonably when recording discussions that were pertinent and relevant to the conspiracy.

Defendants ignore the minimization that the government did on the front-end by only asking to record for one day, in one location, for one meeting, and with the only the subject interceptees, dramatically minimizing the potential for recording privileged, personal, or irrelevant conversations. The Court then authorized and granted the government's request for this minimally invasive wiretap of this one meeting.

Defendants argue that their case is not one where "the nature and scope of the alleged criminal enterprise is a 'large, far-flung and on-going criminal activity involving multiple parties' and the interception is intended to learn the identity of unknown co-conspirators." (Dkt 76 at 13 (citing *Clerkley*, 556 F.2d at 716; and *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975)). In fact, however, their entire argument in support of suppression focuses on distinguishing this case from others where recordings were found admissible, despite recording much more extensively than the government did in this case.

Defendants rely heavily on *Clerkley*, where "[t]he reason the court upheld the decision to admit the interceptions . . . was the nature of the alleged criminal activity and what the agents were hoping to learn from the interceptions." (Dkt 76 at 14; *Clerkley*, 556 F.2d at 717 (affirming reasonableness of continual monitoring of defendant's office over a three week period).) Defendants attempt to distinguish this case by saying that it is not the sort of conspiracy where the interception is intended to learn the identity of unknown co-conspirators.

However, it is clear from the government's application and instructions to the FBI agents that the government was attempting to learn about other individuals potentially involved in

10

similar illegal conduct (which it did). Despite defendants' allegation that the government knew all of the alleged co-conspirators, the Application for the Order Authorizing Interception clearly stated that defendants "and others yet unknown, have committed, are committing, and will continue to commit violations of the [enumerated] offenses." (Dkt 76, Ex. 1, at 2; *see also id.* Ex. 1 at 14 ("the SUBJECT ORAL COMMUNMICATIONS . . . are expected to concern the specifics of the above offenses, including: (i) the nature, extent and methods of the herein-described criminal activities of the SUBJECT INTERCEPTEES and others; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the illegal activities); Ex. 1 at 29 ("The objective of this investigation is to obtain evidence to fully prosecute the SUBJECT INTERCEPTEES, and others as yet unknown, involved in the SUBJECT OFFENSES).) Indeed, other participants in similar illegal activities were discussed during the intercepted communications. (*See* Exhibit 1 at 1:20:30 to 1:26:00 (discussing bribe payments made to Guard Official A by MPSC Official A).)

Importantly, the Fourth Circuit noted in *Clerkley* that "the legitimate investigation of conspiracies may necessitate the interception of all or almost all communications over a given period of time." *Clerkley*, at 716–17 (holding that continual monitoring of a gambling ring over a *three week* period did not offend the statute) (citations omitted); *see also United States v. Johnson*, 935 F.2d 1288, *5 (4th Cir. 1991) (same); *United States v. Berlin*, 707 F. Supp. 832, 834–35 (E.D.V.A. 1989) (noting the leeway given in conspiracy cases under the *Clerkley* factors and how surveillance monitors may be "forced to listen longer than usual to apparently *social conversations* since . . . co-conspirators might be social friends as well as business associates" (emphasis added)). *Clerkley* allows for the recording of even social conversations where conspiracies are involved, yet the FBI agents here—acting reasonably and showing respect for

11

privacy—minimized when defendants' conversation turned social. *Berlin*, 707 F. Supp. at 834–35.

Given the information that the government had—and cited in its affidavit supporting the application for the wiretap—there would be continued financial discussions during the July 9, 2014 MPSC Board Meeting that were relevant to defendants' bribery conspiracy. (Dkt 76, Ex. 1 (quoting Defendant DeBlois: "it's a board decision, because it comes out of everyone's pocket. So it will go back to the Board, on the 9th or I will come in and we're gonna talk all this financial stuff so that will be a piece of it.").) Thus, the FBI agents had reason to record and intercept financial discussions in order to later analyze their importance to the conspiracy.

Assessing the appropriate level of minimization also depends on who is being recorded. Where the recording can include innocent parties, the requirement to minimize is much more stringent but where the speaker is a subject interceptee, minimization expectations are relaxed. The fact that everyone present was a co-conspirator further justifies more continuous monitoring, as at any moment conversation between co-conspirators could provide pertinent information. (*See* Dkt 76, Ex. 1 at 30 ("The attendees will only include the small circle of co-conspirators, the SUBJECT INTERCEPTEES.").) Even when a person is deemed a potential co-conspirator from statements made at the beginning of surveillance, such suspicion "justified the continued monitoring" because "the monitors therefore had the responsibility to listen to any of his conversations which could produce the evidence sought." *United States v. Pine*, 473 F. Supp. 349, 355 (D. Md. 1978). Here, *all* of the individuals being recorded were *known* conspirators.

Other courts have also noted that the government is not required to make extensive efforts to minimize interception of non-pertinent communications between known co-conspirators. *See United States v. Gray*, 372 F. Supp. 2d 1025 (N.D. Ohio 2005); *see also Scott*,

436 U.S. at 140 ("The type of use to which the telephone is normally put may also have some bearing on the extent of minimization required. For example, if the agents are permitted to tap a public telephone because one individual is thought to be placing bets over the phone, substantial doubts as to minimization may arise if the agents listen to every call which goes out over that phone regardless of who places the call. On the other hand, if the phone is located in the residence of a person who is thought to be the head of a major drug ring, a contrary conclusion may be indicated.") Here, the FBI agents were recording conversations in the MPSC conference room amongst the known co-conspirators about their business through which they have operated a scheme to bribe National Guard officials for over ten years.

Indeed, the Fourth Circuit has found interception to be reasonable even when the recording at issue never directly addresses the crime but discusses the motive. *See United States v. Oriakhi*, 57 F.3d 1290 (4th Cir. 1995) (finding admission of the entirety of a tape containing a conversation between the defendant and his sister-in-law reasonable despite fact that the crime was never mentioned, because parties frequently discussed money that the defendant intended to send his family in Nigeria, and the investigation involved a drug conspiracy involving export of drug proceeds to Nigeria). Even more, the Fourth Circuit has upheld the recording of an innocent party for three days as reasonable where informants had provided information that criminal activity would be discussed at some point over those three days. *United States v. Eire*, 822 F.2d 56, 1987 WL 37830, *2 (4th Cir. 1987) (affirming admissibility of incriminating recording found after three days of continuous interception of innocuous calls to an individual who had not previously been under investigation).

A practice of interspersing criminal conversation with innocent conversation, beginning a conversation with innocuous remarks and later turning to criminal matter, or the perceived

likelihood that such a commingling of pertinent and nonpertinent conversation would occur, are also factors to consider in determining the sufficiency of minimization of interceptions under 18 U.S.C. § 2518(5). *See United States v. London*, 424 F. Supp. 556 (D. Md. 1976); *United States v. Berlin*, 707 F. Supp. 832 (E.D. Va. 1989); *United States v. McKinnon*, 721 F.2d 19 (1st Cir. 1983) (concluding that once the parties to a conversation made remarks suggesting that their conversation had turned to criminal matters, monitoring agents were justified in listening to the entire remainder of the conversation). FBI agents are aware of this tendency for subject interceptees to comingle criminal and non-criminal conversations and thus it was imminently reasonable to intercept the business portion of the meeting where discussion of Porter, his bribe payment, his termination, and his severance were all discussed, along with other potential coconspirators.

Courts have also found that there is a higher likelihood that a recorded conversation will float between relevant criminal conversation to personal conversation where there is electronic wiretap eavesdropping rather than wiretaps of phones. Electronic surveillance involves a greater difficulty in determining whether an interception is merely personal in nature as conversation can shift instantaneously to criminal matters, justifying more continuous monitoring. *See Clerkley*, at 717 ("Electronic eavesdropping does not allow this degree of selectivity. Conversation may range over many subjects, shifting instantaneously and without warning. Because of this uncertainty, we cannot say that anything less than continuous monitoring would suffice.") (affirming admissibility of continuous electronic eavesdropping over several weeks).

Courts in the Fourth Circuit have even affirmed the denial of suppression in conspiracy cases where there was no minimization and the telephone wiretap intercepted thousands of calls, on the basis that the nature and scope of the crime "weighs in favor of unrestricted

14

interceptions." *See*, *e.g.*, *United Sates v. White*, 519 F. App'x 797 (4th Cir. 2013). Courts in this Circuit have repeatedly upheld the admissibility of recordings despite a failure to minimize when the surveillance was of premises used in furtherance of a crime. *See*, *e.g.*, *Clerkley*, 556 F.2d at 717 (affirming continuous interception of audio in defendant's office whenever the defendant was present for over 2 weeks); *United States v. London*, 424 F. Supp. 556 (D. Md. 1976) (continuous interception on premises used for an illegal gambling operation). Other districts to address the situation have followed suit. *See United States v. Dalia*, 426 F. Supp. 862, 871 (D.N.J. 1977) (affirming admissibility despite interception of nonpertinent conversations because the criminal and lawful activities were so closely related, making it "difficult to establish if a particular conversation related to an innocent business transaction or to the sale of stolen goods"); *United States v. Hurley*, 63 F.3d 1 (1st Cir. 1995) (money-laundering operation deliberately disguised by the company's legal activities).

There was also significant judicial supervision in the execution of this wiretap. There was proactive narrowing and judicial oversight by making the wiretap authorization to only be for 20 hours. The Fourth Circuit noted in *Clerkley* that "[w]here the authorizing judge required and reviewed interim reports, courts have been more willing to find a good faith attempt at minimization." 556 F.2d at 718 (citing *Quintana*, 508 F.2d at 875). The Court here was given a report after the 20-hour period of authorization, detailing that the government had recorded less than three hours of communications.

In this case, the recording took place in the MPSC conference room, was for less than three hours, for one meeting, and with only the subject interceptees. It was an electronic eavesdropping wiretap and thus, the interceptees were more likely to float between pertinent and non-pertinent conversations. The Defendants engaged in a widespread conspiracy for over ten

years through the usage of their company, and the FBI agents acted more than reasonably in minimizing their personal communications but continuously recording their business discussions.

### 3.    Suppression of the recording is not an appropriate remedy.

Even if the Court were to conclude that the agents conducting the interception did not properly minimize, suppression of the relevant parts of the recording—which defendants do not dispute were properly intercepted—would not be an appropriate remedy here. The failure to make good-faith efforts to comply with the minimization requirement is not itself a violation of [the Fourth Amendment and] § 2518(5) of Title III. *See Scott v. United States*, 436 U.S. 128 (1978) (finding objectively reasonable the interception in full of 384 calls over a one-month period, where monitors knowingly and willfully failed to minimize). Indeed, "§ 2515 was not intended generally to press the scope of the suppression role beyond present search and seizure law." *Id.* at 139 (citing S. Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968), U.S. Code Cong. & Admin. News 1968, p. 2185; and *Alderman v. United States*, 394 U.S. 165, 175–176 (1969)).

Where courts have determined that suppression is appropriate, they have suppressed only the conversations that were found to have been inappropriately recorded. *United States v. Orena*, 883 F. Supp. 849 (E.D.N.Y. 1995) ("Although neither the Supreme Court nor the Second Circuit has squarely addressed this issue, several courts have held that a failure to minimize interceptions requires suppression only of the unauthorized interceptions and not of all conversations—much less the fruits of all conversations—overheard pursuant to the court-authorized surveillance."); *United States v. Parks*, 1997 WL 136761 (N.D. Ill.) (requiring that the defendant show that the government "flagrant[ly] disregard[ed]" minimization requirements in order to suppress the entire wiretap); *but see United States v. Simels*, 2009 WL 1924746 (E.D.N.Y.) ("I conclude that when the surveillance, viewed as a whole, violates the minimization

requirement of 18 U.S.C. § 2518(5), every communication conducted during that surveillance was obtained unlawfully, and should be suppressed.") (Gleeson, J.).

### C. The recording is not so unintelligible that it is untrustworthy or more prejudicial than probative.

Defendants also argue that the recording of the July 9, 2014 MPSC board meeting was so unintelligible that it should be thrown out as too prejudicial. Again, defendants argument is not support by precedent or the facts. (The government has filed the recording at issue for the Court's review under seal as Exhibit 1. The recording was previously produced to defendants.)

In deciding whether to admit partially inaudible audio tapes, a district court should assess whether the unintelligible portions of the tapes are so substantial, in view of the purpose for which they are offered, as to render the recordings as a whole untrustworthy; the court should consider whether the tapes are audible enough to provide the jury with the gist of the conversations, as well as whether the defendant was given an opportunity to offer his version of the inaudible portions so as to clear up whatever ambiguities the tapes might have raised. *See United States v. Trogdon*, 575 F.3d 762 (8th Cir. 2009). The mere fact that portions of a tape are inaudible does not require exclusion of the tape. "Unless the unintelligible portions are so substantial as to render the recordings as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the judge." *United States v. Arango-Correa*, 851 F.2d 54 (2d Cir. 1988); *see also United States v. Wilkinson*, 53 F.3d 757 (6th Cir. 1995); *United States v. Rrapi*, 175 F.3d 742 (9th Cir. 1999). Any complaint about possible exculpatory material on the omitted portions of the recorded conversations would not raise a *Brady* issue in that the defendants were parties to the conversations and therefore equally aware of what was said. *United States v. Dawson*, 425 F.3d 389 (7th Cir. 2005).

17

The recording here readily meets these requirements. Despite their specific minute calculation and determination of the period in which defendants are discussing their plan to pay a 1% bribe to Porter, defendants argue "[w]hile certain words or phrases can be discerned, rarely is more than an entire sentence or two at a time intelligible." (Dkt 76 at 17.) While the recording is not as clear as a movie—which is not surprising for a surreptitious recording—this assertion is simply not true. The beginning of the tape is somewhat muted, due to background noise and the fact that the individual speaking seems to be furthest away from the recording device. However, later portions of the recording are much more clearly audible. Most importantly, the portion of the recording where defendants discuss the 1% bribe payment they plan to make to Porter is understandable and intelligible.

> ### D. An evidentiary hearing is not required.

While defendants argue that a hearing is required because the Court is required to view the recording in order to make findings, the Court now has the recording to review. (*See* Exhibit 1.)

Additionally, an evidentiary hearing is not required here because defendants have not raised an issue of fact that they have supported with offered proof. *See United States v. Muldoon*, 931 F.2d 282 (4th Cir. 1991) (affirming the district court's denial of defendant's motion for evidentiary hearing in bribery case because the defendant failed to make the requisite showing for an evidentiary hearing, which would require a substantial showing that the wiretap affiant made a false statement knowingly and intentionally or with reckless disregard for the truth); *United States v. Eccleston*, 615 F. App'x 767 (4th Cir. 2015) (in a case arising from drug conspiracy charges, the court denied defendant's motion to suppress Title III wiretaps and the request for an evidentiary hearing because there was sufficient evidence of probable cause to grant the wiretap application and there was no proof that the affiant intended to mislead the

court, which was demonstrated by the fact that the affiant relied on information from three sources, reports from law enforcement officials, other evidence, and personal knowledge); *United States v. Starner*, 60 F. App'x 156 (4th Cir. 2015) (rejecting the claim that the district court erred by failing to conduct an evidentiary hearing regarding the motion to suppress wiretap evidence in a case arising from conspiracy to distribute drug charges because the defendant failed to offer proof that a wiretap affidavit contained indications of deliberate falsehood or reckless disregard for the truth); *United States v. Ramazani*, 924 F.2d 1053 (4th Cir. 1991) (motion to suppress and motion for an evidentiary hearing were denied); *see also Franks v. Delaware*, 438 U.S. 154 (1978) (holding that an evidentiary hearing is only warranted when the showing is more than conclusory and other evidence is offered to overcome the presumption of the warrant's validity).

## II.     DeBlois's motion for sanctions (Dkt 72) should be denied.

Defendant Ross DeBlois has moved the Court for sanctions relating to his interview by FBI Agents Kaup and Damico at his home on September 30, 2014. DeBlois's motion is based upon his claim that he made written modifications to a written statement provided by the FBI agents. DeBlois's motion should be denied because the government has been in full compliance with Rule 16 and the agents acted in good faith in every respect.

### A.     Factual background relating to the interview of DeBlois.

On September 30, 2014, FBI Special Agents Frank Damico and Peter Kaup went to Ross DeBlois's home in Fairfax County, Virginia to interview him about the bribery scheme involving Robert Porter and other corruption involving MPSC and the National Guard Bureau. At the time of the interview, DeBlois was the CEO of MPSC. Upon arriving at DeBlois's home, the agents knocked on the door and were greeted by one of DeBlois's family members, who agreed to get DeBlois. When DeBlois came to the door, the agents identified themselves as agents with the

19

FBI and informed him that they would like to speak with him. DeBlois indicated that he was willing to speak with them and invited them into his home. He then led them to his study, which was adjacent to the entryway of the home. Once inside the study, the agents informed DeBlois that he was not under arrest and that it was entirely his decision whether or not to speak with them. DeBlois agreed to speak with the agents and did so for the next couple of hours.

During the interview DeBlois discussed his role with MPSC and his background with the National Guard Bureau. He was then asked about the 1% bribery scheme with Robert Porter. DeBlois acknowledged the 1% scheme with Porter and further acknowledged that he knew about it years before the July 2014 Board of Director's meeting.

After DeBlois acknowledged the bribery scheme and payment with Porter, Agent Kaup decided to attempt to have DeBlois provide a written statement. Agent Kaup wrote a brief introduction on a piece of paper with the hopes that DeBlois would be willing to memorialize his admissions to the 1% bribery scheme. DeBlois was presented with the pad of paper and asked if he was willing to provide a written statement to the agents. DeBlois declined to provide a written statement and never wrote anything on the pad, nor did he cross anything out at all. He never even put the pen to the paper. DeBlois simply looked at the piece of paper, declined to provide a written statement, and continued with the interview. The rest of the interview remained cordial, with DeBlois continuing to speak with the agents. It is notable that DeBlois never recanted his statement about the 1% deal with Porter or sought to change or modify it in any respect. After a couple hours, the agents informed DeBlois that he was in a good position to cooperate and they ended the interview without incident.[2]

---

[2] Should the Court determine that an evidentiary hearing is warranted on this motion, the government is prepared to present testimony from Agent Damico or Agent Kaup supporting the facts recited above.

**B.      The government has fully complied with Fed. R.Crim. P. 16(a)(1)(B).**

Defendant DeBlois has moved for sanctions, claiming that the agents destroyed a written statement that was required to be produced under Fed. R. Crim. P. 16(a)(1)(B). DeBlois's claim is entirely without merit. He never provided a written statement to the agents and, as such, the government is in full compliance with Fed. R. Crim. P. 16(a)(1)(B).

Fed R. Crim. P. 16(a)(1)(A) provides that, upon a defendant's request, the government must provide "the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Fed. R. Crim. P. 16(a)(1)(A). Here, the government has fully complied with Fed. R. Crim. P. 16(a)(1)(A). The government has provided the defendant a full detailed report of his interview with the agents. (*See* Exhibit 2.) The report detailed DeBlois's background with the National Guard Bureau, his work at MPSC, the 1% bribery scheme with Robert Porter, and other topics.

Rule 16(a)(1)(B) provides three circumstances under which the government must, upon request, disclose and make available certain written or recorded statements made by the defendant. *First*, "any relevant written or recorded statement [made] by the defendant" is discoverable if two prerequisites are met: "the statement is within the government's possession, custody, or control" and "the attorney for the government knows—or through due diligence could know—that the statement exists." Fed. R. Crim. P. 16(a)(1)(B)(i). *Second*, "the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent." Fed. R. Crim. P. 16(a)(1)(B)(ii). *Third*, "the defendant's recorded testimony before a grand jury relating to the charged offense" is also discoverable on the defendant's request. Fed. R. Crim. P. 16(a)(1)(B)(iii).

Again, the government is in full compliance with Fed. R. Crim. P. 16(a)(1)(B)(i), (ii), and (iii) because DeBlois made no statements that fit into any of those three categories. Contrary to DeBlois's claim, he never provided a written statement, never crossed anything out from a statement and never even put pen to paper. If he had done any of these three things, the agents would have kept the piece of paper and it would have been provided to DeBlois. Notably absent from DeBlois's affidavit is any detail whatsoever about the specific content he supposedly wrote, crossed out or disagreed with.

The government welcomes an evidentiary hearing in this matter. At the hearing, the agents will testify that DeBlois never provided a written statement of any kind, that he never crossed anything out from a written statement, and that they would have preserved such a statement if DeBlois had done so. Because DeBlois made no written statement, there is no basis for sanctions; the government has complied with its discovery obligations and the agents acted in good faith in every respect.[3]

### III.    Livingston and Tipa's motion for severance (Dkt 63) should be denied.

As discussed above, during his September 30, 2014 interview with Agents Peter Kaup and Frank Damico, defendant Ross DeBlois provided a detailed admission of the 1% bribery scheme between Robert Porter and MPSC. In that admission, DeBlois also implicated defendants Ronald Tipa and Edwin Livingston for their role in the scheme. Tipa and Livingston have now moved to either preclude the admission of DeBlois's statement or to sever the case into two separate trials. Both of these options should be rejected because a minor modification of DeBlois's statement is all that is required to comply with *Bruton v. United States*, 391 U.S. 123 (1968).

---

[3] DeBlois has requested a copy of the agent's notes of the interview as part of his motion. The government has attached a copy of the notes as Exhibit 3.

Since *Bruton* does not prohibit the admission of the confession of a non-testifying codefendant that has been altered so as to replace the implicated defendant's name with a neutral pronoun, severance or precluding the government from using DeBlois's statement goes too far. To be sure, the government agrees with aspects of the motion, to the extent that under the Confrontation Clause, a confession of a non-testifying co-defendant that implicates Tipa or Livingston would not be admissible in a joint trial, even if the Court instructs the jury that the confession can be used only against the co-defendant and must be disregarded with respect to the implicated defendant. This is *Bruton*'s unequivocal holding.

However, several aspects of the *Bruton* rule—and its exceptions—may render a statement of one or more of the co-defendants admissible in a joint trial. *First*, *Bruton*'s rule applies only to confessions by *non-testifying* co-defendants. Once a co-defendant takes the witness stand, there can be no violation of an implicated defendant's confrontation right, since the implicated defendant can cross-examine regarding the co-defendant's alleged confession. *See Joyner v. United States*, 547 F.2d 1199, 1202 n.5 (4th Cir. 1977) ("Of course, when [the co-defendant] subsequently took the stand, the Bruton objection was no longer seasonable."). *Second*, statements excluded under the *Bruton* rule should not be confused with statements made by non-testifying co-conspirators in furtherance of the conspiracy, which are admissible against all conspirators under Fed. R. Evid. 801(d)(2)(E). Thus, if one of their co-defendants made a statement during the course and in furtherance of the conspiracy, *Bruton* is inapplicable, and the statement is fully admissible against Tipa and Livingston. *See United States v. Brooks*, 957 F.2d 1138, 1146 (4th Cir. 1992). *Third*, even if a non-testifying co-defendant's confession expressly refers to a defendant, admission of the confession may not violate *Bruton* if the reference cannot fairly be understood to incriminate the defendant. *See United States v. Locklear*, 24 F.3d 641,

23

645–46 (4th Cir. 1994) (observing that co-defendant's redacted statement could not fairly be understood to incriminate defendant Locklear, where in redacted statement co-defendant admitted "that he was familiar with the Locklear brothers and that he had known them all his life").

The *fourth* exception is implicated in this case. In this situation, notwithstanding *Bruton*, if a non-testifying co-defendant's statement is redacted to eliminate any reference to the defendant, or if the defendant's name is replaced by a symbol or neutral pronoun, such statement is admissible. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Lighty*, 616 F.3d 321, 376–77 (4th Cir. 2010); *United States v. Vogt*, 910 F.2d 1184, 1191 (4th Cir. 1990). Further, "[i]f a proffered statement of one non-testifying co-defendant becomes incriminating against another by virtue of an inference from other evidence at trial, the Confrontation Clause may not be offended if those statements are redacted and a proper limiting jury instruction is given." *Lighty*, 616 F.3d at 376.

On the other hand, redactions that obviously identify a defendant, even without naming him, effect a constitutional violation that cannot be cured by a jury instruction. *Gray v. Maryland*, 523 U.S. 185, 195-96 (1998). But *Gray* differentiates between statements that incriminate by reference or only when linked with later evidence and those that obviously refer to a particular person or involve inferences a jury could make even without additional evidence. Only in the latter instance does a constitutional violation occur. *Lighty*, 616 F.3d at 376–77 (citations omitted). Thus, after *Gray* the Fourth Circuit has continued to allow general references to "another person" or "another individual" in the statements of non-testifying co-defendants, since in *Gray* the Supreme Court "has strongly implied that such statements do not offend the Sixth Amendment." *United States v. Akinoye*, 185 F.3d 192, 198 (4th Cir. 1999).

24

In the instant case, the government expects to offer DeBlois's confession at trial through testimony of Agent Kaup or Agent Damico, who interviewed him. After the interview, Agent Damico prepared a "302" report summarizing the interview. (*See* Exhibit 2.) In support of their motion, Tipa and Livingston have identified three sections from this report where *Bruton* is implicated, and they contend that nothing short of suppression or severance will sufficiently safeguard their rights. But each one of these statements can be sufficiently replaced with neutral pronouns to comply with *Bruton.* The following are the sections identified by defendants Tipa and Livingston:

> (1) DEBLOIS disclosed having knowledge of TIPA's and LIVINGSTON's promise to pay retired Colonel ROBERT L. PORTER, a/k/a ROB PORTER, one percent (1%) of any government contract which PORTER could steer MPSC during his tenure at the NGB. DEBLOIS initially learned of this promise "a few years ago" from LIVINGSTON and/or TIPA while PORTER was still on active-duty at the NGB. However, DEBLOIS could not specifically recall the details of this conversation and/or when it initially occurred. DEBLOIS confirmed that he recently authorized the payment of $55,000 to PORTER for this purpose. DEBLOIS also acknowledged recently being asked by TIPA and/or LIVINGSTON to confirm the dollar amounts of the three (3) NGB contracts which PORTER reportedly steered to MPSC.
>
> (2) DEBLOIS stated LIVINGSTON clearly believed PORTER possessed influence over the awarding of the three (3) NGB contracts and was personally responsible for helping MPSC obtain these contracts. DEBLOIS learned this directly from LIVINGSTON.
>
> (3) DEBLOIS believed MPSC's Board of Directors authorized the payment to PORTER because LIVINGSTON felt badly about PORTER's upcoming termination from the company. As such, DEBLOIS speculated the payment was nothing more than a way to take care of LIVINGSTON's friend before he was terminated from MPSC.

The government agrees that each portion identified by defendants Tipa and Livingston implicates the *Bruton* rule because each contains direct references to Tipa or Livingston.

However, the government disagrees that the only way to comply with *Bruton* is either severance or suppression of the statement. Compliance with *Bruton* in the case simply requires minor modifications to the statement to eliminate direct references to Tipa and Livingston. The government suggests substituting the names of Tipa and Livingston with neutral pronoun such as "others," "another," or something comparable and acceptable to the Court. Under *Bruton*, no other alterations would be required to render DeBlois's statement admissible at a joint trial with Tipa and Livingston.

As in *Akinoye*, if such alterations were made there would be no way, on the face of the statement, to identify Tipa and Livingston from DeBlois's confession. Further, unlike in *Gray*, it would be unclear to the jury that DeBlois's confession had been altered at all. (Not to mention that the substance of the confession would likely come into evidence through the testimony of an agent, not through the written document.) Only when DeBlois's confession is linked with anticipated in-court testimony (which Tipa and Livingston will have an opportunity to challenge through cross examination) might one even infer that DeBlois's confession refers to Livingston or Tipa. *See Lighty*, 616 F.3d at 377.

Thus, the proposed modification of DeBlois's confession, combined with an appropriate instruction to the jury not to consider the confession of one co-defendant as evidence against another, will fully protect defendants Tipa's and Livingston's rights under the Confrontation Clause. Accordingly, this Court should deny Tipa and Livingston's motion for severance or to exclude from the trial any evidence of extra-judicial statements made by DeBlois, subject to the government's compliance with *Bruton* and its progeny.

## IV.   Defendants' motion to dismiss multiplicitous counts (Dkt 78) should be denied.

Defendants have filed a "Motion to Dismiss Multiplicitous Counts" (Dkt 78). They argue that the indictment is multiplicitous because it "charges the defendants with two different sets of

statutory offenses": (1) bribery of a public official under 18 U.S.C. § 201(b)(1), plus conspiracy to commit bribery and to defraud the United States under 18 U.S.C. § 371; and (2) honest-services wire fraud under 18 U.S.C. §§ 1343 and 1346, plus conspiracy to commit honest-services wire fraud under 18 U.S.C. § 1349. Defendants argue that "[b]oth sets of statutory offenses are premised on the same alleged conduct," which, defendants contend, violates the rule against multiplicity.

Defendants do not cite a single case from any court supporting their arguments, and with good reason: their motion is meritless. A straightforward application of the *Blockburger* test makes clear that § 201(b)(1) bribery and honest-services wire fraud are not multiplicitous because they each require proof of an element that the other does not. The same conclusion applies when *Blockburger* is applied to the two conspiracy counts. For those reasons, and as explained below, defendants' "Motion to Dismiss Multiplicitous Counts" should be denied.

**A.     In assessing a claim of multiplicity, the court applies the *Blockburger* test to the elements of the offenses at issue—not the actual conduct alleged in the indictment.**

Defendants contend that "[t]o determine whether two charges constitute the same offense and are therefore multiplicitous, the Court must decide whether they are both *premised on the same conduct*." (Dkt 78 at 6 (emphasis added).) This is incorrect. To the contrary, "[w]hen a single course of conduct violates multiple statutes, multiple punishments may be imposed without violating the Double Jeopardy Clause, if that is what Congress intended." *United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008).

To determine "what Congress intended," this Court "is guided by the Supreme Court's decision in *Blockburger v. United States,* 284 U.S. 299, (1932)," which directs the Court to "examine whether proof of each crime 'requires proof of an additional fact which the other does not.'" *United States v. Terry*, 86 F.3d 353, 355–56 (4th Cir. 1996) (quoting *Blockburger*, 284

27

U.S. at 304); *see also, e.g.*, *United States v. Goodine*, 400 F.3d 202, 207–08 (4th Cir. 2005) (noting that, under the *Blockburger* test, the court looks "to whether each charged offense requires proof of some fact that the other does not require"). "If . . . the statutory elements of the two crimes do not overlap, then multiple punishments are presumed to be authorized absent a clear showing of contrary Congressional intent. *Id.*; *Chandia*, 514 F.3d at 372.

"[F]or purposes of double jeopardy analysis we examine only the statutory elements to determine if the elements of the two crimes charged *necessarily* overlap." *Terry*, 86 F.3d at 356. Indeed, in conducting the double-jeopardy analysis, it is of no moment that numerous charges may "arise out of a 'single scheme'" and "it is not material that the overt acts charged to support two separate offenses are the same." *United States v. Dorfman*, 532 F. Supp. 1118, 1127 (N.D. Ill. 1981). Rather, "[t]he criteria for examining a claim of multiplicity is whether the substantive offenses charged must be supported by different proof." *Id.*

**B.     A *Blockburger* analysis of the elements of § 201(b)(1) bribery and honest-services wire fraud confirms that each offense requires proof of an element that the other does not require.**

To prove bribery of a public official under § 201(b)(1), the government must establish that defendants: (1) directly or indirectly, corruptly gave, offered, or promised anything of value (2) to a public official, (3) with intent to influence an official act (or with intent to influence the official to commit, collude in, allow, or make opportunity for the commission of a fraud on the United States; or to induce the official to do or omit to do an act in violation of his official duty). *United States v. Harvey*, 532 F.3d 326, 334–35 (4th Cir. 2008); *see also, e.g.*, *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998); *United States v. Muldoon*, 931 F.2d 282, 287 (4th Cir. 1991); *United States v. Velazquez*, 847 F.2d 140, 141 (4th Cir. 1988); 2 O'Malley, Grenig and Lee, *Federal Jury Practice & Instructions* § 27:03 (6th ed.).

28

To prove honest-services wire fraud, the government must establish that defendants engaged in: (1) a scheme or artifice to defraud another of the intangible right of honest services, (2) that involved a material misrepresentation or concealment of fact, (3) undertaken with the specific intent to defraud, and (4) furthered by the use of interstate wire communications. *Harvey*, 532 F.3d at 333; *see also, e.g.*, 2A O'Malley, Grenig and Lee, *Federal Jury Practice & Instructions* § 47:07 (6th ed.).

Setting the elements of each statute side by side, it is clear that the charges here pass the *Blockburger* test. Bribery requires proof not required for honest-services fraud: that the thing of value be given to a "public official" for an official act. *See, e.g.*, *Skilling v. United States*, 561 U.S. 367, 413 n.45 (2010) ("The principal federal bribery statute, § 201, . . . generally applies only to federal public officials, so § 1346's application to state and local corruption and to private-sector fraud reaches misconduct that might otherwise go unpunished."). Likewise, honest-services wire fraud requires proof of at least one element not required for bribery: use of interstate wire communications. Because the required elements do not overlap, the two charges are not multiplicitous. *See, e.g.*, *United States v. Bailey*, 112 F.3d 758, 767 (4th Cir. 1997) (finding two-count indictment not to be multiplicitous where "the domestic violence statute requires proof of several facts which the kidnapping statute does not, the most obvious of which is that the victim be 'a spouse or intimate partner,'" and where "the kidnapping statute requires proof of the additional element that the defendant held the victim 'for ransom or reward or otherwise'").

The facts in this case demonstrate how a jury could potentially convict defendants on either the § 201(b)(1) count or the § 1346 counts, but not both. For example, perhaps the jury will conclude that the government failed to establish that Porter was a "public official." In that

case, the jury could return verdicts of guilty on the § 1346 counts but acquit on the § 201(b)(1) count. Or perhaps the jury will conclude that the government failed to prove that any of the wires charged in this case actually traveled in interstate commerce. In that case, the jury could return verdicts of guilty on the § 201(b)(1) count but acquit on the § 1346 counts.

C.    *Skilling* **does not make § 201(b)(1) bribery a lesser-included offense of honest-services wire fraud.**

Defendants concede that "honest services wire fraud requires proof of a fact which bribery does not—namely, proof of the use of a wire in furtherance of the scheme." (Dkt 72 at 8 (alterations omitted).) Contrary to the analysis above, however, they contend that "bribery does not require proof of a fact which honest services wire fraud does not," thus failing the *Blockburger* test. (Dkt 78 at 7–8 (alterations and internal quotation marks omitted).) Defendants base their argument on *Skilling v. United States*, which held that the honest-services statute covers only ""bribery and kickback schemes." 561 U.S. 367 (2010). According to defendants, because honest services fraud can *only* be committed through bribery or kickbacks, "[p]roof of honest services wire fraud therefore necessarily requires proof of all of the elements of the substantive offense of bribery."

Defendants are incorrect (and they do not offer a single case supporting their position). They are improperly attempting to equate "bribery," generally described, with the specific offense of public-official bribery under § 201(b)(1). While *Skilling* indeed held that § 1346 covers only schemes to deprive another of honest services through "bribes or kickbacks," 561 U.S. at 404, *Skilling* nowhere suggested that *only* a § 201(b)(1) bribery scheme qualifies. To the contrary, the Court made clear that a charge under § 1346 could be based, for example, on a bribery scheme directed at state or local officials—which would not be a crime under § 201(b). *Id.* at 413 n.45. Or a § 1346 charge could be based on a bribery scheme involving private-sector

fraud—which also would not be a crime under § 201(b). *Id.* That is why *Skilling* stated simply that § 1346's prohibition on bribes and kickbacks "draws content . . . from" § 201(b) and other "federal [bribery] statutes proscribing—and defining—similar crimes." *Id.* at 413. And that is why the Court emphasized that this mere "[o]verlap with other federal statutes does not render § 1346 superfluous." *Id.* at 413 n. 45.[4]

---

[4] The Court could have also cited numerous cases from this circuit and others affirming convictions for charges under both § 201(b)(1) and § 1346. *See, e.g.*, *United States v. Harvey*, 532 F.3d 326, 332 (4th Cir. 2008) ("In April 2006, the government indicted Harvey and Kronstein on two counts of honest services wire fraud, alleging that, between November 1998 and March 2002, they aided and abetted each other in a scheme to defraud the United States and the Army in violation of 18 U.S.C. §§ 1343, 1346 and 2. The indictment further named Harvey in one count of bribery in violation of 18 U.S.C. § 201(b)(2)(A), which applies to public officials who accept bribes, and Kronstein in one count of bribery in violation of 18 U.S.C. § 201(b)(1)(A), which applies to those who bribe public officials."); *United States v. Pressley*, 518 F. App'x 713, 714 (11th Cir. 2013) ("The Pressleys were each convicted of one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371; one count of bribery, in violation of 18 U.S.C. § 201(b)(2)(A); eight counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and eleven counts of engaging in monetary transactions with criminal proceeds, in violation of 18 U.S.C. § 1957."); *United States v. Williams*, 496 F. App'x 147, 148 (2d Cir. 2012) ("Williams was convicted of engaging in a scheme to deprive the United States of honest services under 18 U.S.C. §§ 1341, 1346 and accepting bribes in violation of his official duties as a military officer under 18 U.S.C. § 201(b)(2)(A) and (C)."); *United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) ("[T]he jury's guilty verdict on the separate substantive count of bribery in violation of 18 U.S.C. § 201 confirms beyond any reasonable doubt that the jury would have convicted Wilkes of honest services fraud if the court's definition had been limited to the bribery basis that *Skilling* expressly approved."); *United States v. Smith*, 429 F. App'x 840, 845 (11th Cir. 2011) ("A jury could reasonably infer that Long had accepted something of value in return for being influenced in the performance of an official act in violation of section 201(b)(2)(A) and that he used wire communication to carry out a scheme to defraud in violation of section 1343."); *Skrzypek v. United States*, 425 F. App'x 516 (7th Cir. 2011) ("They were convicted of multiple crimes, including racketeering, 18 U.S.C. § 1962(c), mail and wire fraud, *id.* §§ 1341, 1343, bribing public officials, *id.* § 201(b), obstruction of justice, *id.* § 1503(a), and failure to remit withholding tax, 26 U.S.C. § 7202."); *United States v. Jeong*, 624 F.3d 706, 709 (5th Cir. 2010) ("Jeong was initially charged with two counts of federal bribery under 18 U.S.C. § 201(b)(1). A superseding indictment in May 2009 added one count of conspiracy under 18 U.S.C. § 371, and two counts of honest services wire fraud under 18 U.S.C. §§ 1343, 1346.").

**D.      A *Blockburger* analysis of the elements of § 371 conspiracy and § 1349 conspiracy confirms that each offense requires proof of an element that the other does not require.**

Defendants also argue, in a single sentence, that "[f]or the same reasons" conspiracy to commit bribery (charged in Count 1 under 18 U.S.C. § 371) is a lesser-included offense of conspiracy to commit honest-services wire fraud (charged in Count 3 under 18 U.S.C. § 1349). But defendants do not offer a single case—and the government is not aware of any—suggesting that § 371 and § 1349 are multiplicitous. This argument likewise fails.

To prove conspiracy under § 371, the government must establish: "(1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States." *United States v. Tedder*, 801 F.2d 1437, 1446 (4th Cir. 1986). To prove conspiracy under § 1349, the government must establish that: (1) two or more persons made an agreement to commit an unlawful act "under this chapter"; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose." *United States v. Logan*, 593 F. App'x 179, 185 (4th Cir. 2014) (quoting *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014)).

Again, setting the elements of each statute side by side, it is clear that the charges here pass the *Blockburger* test. Conspiracy under § 371 requires proof of at least one element not required for conspiracy under § 1349: an overt act.[5] Likewise, conspiracy under § 1349 requires proof of at least two elements not required for conspiracy under § 371: (1) proof that the conspiracy involved the use of a wire, and (2) proof that the conspirators agreed to violate a

---

[5] Count 1 of the indictment charges conspiracy not only to bribe a public official but also to defraud the United States. To the extent that the § 371 count also requires proof that the conspiracy embraced bribery of a public official, his provides a further hurdle to defendants' argument that § 371 and § 1349 are multiplicitous.

statute in Chapter 63 of Title 18. *United States v. Ngari*, 559 F. App'x 259, 269 (5th Cir. 2014). These distinctions are especially critical in this case, in which the government anticipates that at least some of the defendants will argue at trial that they lacked the requisite conspiratorial mental states.

Consistent with this conclusion, at least one court of appeals has remarked that charges under § 371 and § 1349 are not multiplicitous. *See, e.g.*, *United States v. Njoku*, 737 F.3d 55, 67 (5th Cir. 2013) ("Section 1349 requires proof of a conspiracy to commit an offense of fraud and that such fraud is the object of the conspiracy. Section 371 prohibits two or more persons from conspiring to commit any offense against the United States. Further, Section 371 requires proof of an overt act, which Section 1349 does not."); *United States v. Jones*, 733 F.3d 574, 584 (5th Cir. 2013) ("Section 371 contains an overt-act requirement, but Section 1349 does not contain an overt-act requirement. Furthermore, 18 U.S.C. § 1349 prohibits conspiring 'to commit any offense under this chapter[,]' but Henry's 18 U.S.C. § 371 conviction was based on a conspiracy to violate a section of Title 42. We find that there was no multiplicity violation in this case."); *see also, e.g.*, *United States v. Pena-Gonzalez*, 62 F. Supp. 2d 366, 370-71 (D.P.R. 1999) ("Section 846 requires proof of a conspiracy to commit a narcotics offense which involves possession or distribution of a controlled substance. On the other hand, section 924 requires a conspiracy to possess firearms which involves possession of a firearm. Simply because both statutes relate to narcotics crimes and concern conspiracies does not make them multiplicitous."). Defendants do not cite, and the government is not aware of, any case holding to the contrary.

### E. Where a defendant claims that an indictment is multiplicitous because it contains lesser- and greater-included offenses, pretrial dismissal is not the appropriate remedy.

In the second half of their memorandum in support of their motion to dismiss, defendants contend that the district court should dismiss the allegedly multiplicitous counts prior to trial. "If

the government is allowed to proceed on an indictment that charges the same conduct in multiple counts," they argue, "there is the risk that the jury will be confused and/or prejudiced by the allegation that the defendants committed multiples crimes." (Dkt 78 at 9.) For the reasons given above, the charges here are not multiplicitous, so the Court should not dismiss them at all—before or after trial. Even if the Court were to disagree, however, and conclude that the charges are multiplicitous, defendants are not entitled to have any charges dismissed before trial.

When courts speak of multiplicity, they generally refer to two separate but related concepts. *First*, an indictment may be multiplicitous if it charges multiple violations of the same statute, all predicated on arguably the same criminal conduct. (For example, where a felon arrested with five firearms is charged with five counts under 18 U.S.C. § 922(g), or where a defendant who conspired to traffic marijuana, heroin, and cocaine is charged with three counts under 21 U.S.C. § 846.) *Second*, an indictment may be multiplicitous where a defendant is charged with violating two different statutes and one of the statutes arguably establishes a lesser-included offense of the other. Defendants' challenge in this case falls under the second category, as underscored by the fact that they refer to § 201(b)(1) bribery as a lesser-included offense of honest services wire fraud and § 371 conspiracy as a lesser-included offense of § 1349 conspiracy. (Dkt 78 at 8–9.)

When multiplicity arises in this context of lesser- and greater-included offenses, the Supreme Court has made clear that the government may simultaneously proceed on both charges (or at least obtain jury instructions relating to a lesser-included offense), not least because of the possibility that the jury may find the defendant guilty of the lesser-included offense but acquit on the great offense. *See, e.g.*, *Ball v. United States*, 470 U.S. 856, 865 (1985) ("If, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he

should instruct the jury as to the elements of each offense. Should the jury return guilty verdicts for each count, however, the district judge should enter judgment on only one of the statutory offenses."); *United States v. Gaddis,* 424 U.S. 544, 550 (1976) (stating that "there can be no impropriety . . . for a prosecutor to file an information containing counts charging violations of" several different provisions of the federal bank robbery statute where there is evidence to support the charges, even though the defendant could not in the end stand convicted of all the offenses).

Thus, where charges are found to be multiplicitous because one is a lesser-included offense of another, the proper remedy is not pretrial dismissal but rather for the district court to "'enter judgment on only one of the statutory offenses,'" with a "long line of authorities directing vacation of the conviction that carries the more lenient penalty." *United States v. Brown*, 701 F.3d 120, 127–28 (4th Cir. 2012) (quoting *Ball*, 470 U.S. at 865); *see also, e.g.*, *United States v. Deloach*, No. 99-4441, 2000 WL 274972, at *1 (4th Cir. Mar. 14, 2000) ("The judicial system allows the Government 'to carve up criminal conduct into multiple counts, even if some of the counts are lesser included offenses or constitutionally identical offenses.' . . . [T]he multiplicity problem . . . [i]s remedied when the court dismisse[s] the multiplicitous counts at sentencing."); *United States v. Hasan*, 747 F. Supp. 2d 642, 704 (E.D. Va. 2010), *aff'd sub nom.*, *United States v. Dire*, 680 F.3d 446 (4th Cir. 2012) (finding that overlapping counts "need not be dismissed as multiplicitous at this time, because they would, notwithstanding their overlapping elements, still constitute greater and lesser included offenses" and because, should the defendant be convicted on both counts, "he may move at that time to have the lesser count dismissed").

Defendants' motion ignores this distinction. Indeed, the cases defendants cite in support of their argument—including the only Fourth Circuit case they rely on—generally involve multiplicity arising from multiple charges under the same statute, not from charges of lesser- and

greater-included offenses. In *United States v. Colton*, 231 F.3d 890 (4th Cir. 2000), for example, the defendant's multiplicity claim was that he was prejudiced by the presence of "four bank fraud counts," under 18 U.S.C.§ 1344, which all "charge[d] separate acts in furtherance of a single overall scheme." *Id.* at 908. Even in that context, however, the court of appeals noted that "the principal danger created by multiplicity is that a defendant will receive multiple punishments for a single offense," and rejected defendant's claim that he was prejudiced by the presentation of multiplicitous charges the jury, where "exactly the same evidence was offered to prove all four counts." *Id.* at 910.

And indeed other Fourth Circuit cases have similarly declined to find jury prejudice even where defendant was charged with and the jury rendered a verdict on numerous counts under the same statute. *See, e.g.*, *United States v. Lawing*, 703 F.3d 229, 236 (4th Cir. 2012) (rejecting defendant's multiplicity argument when he was tried on two counts under the same statute and noting that "[e]rror only stems from multiplicity when a defendant is punished for multiple convictions on the same offense: reversal is warranted if the defendant actually was convicted on multiplicitous counts and subjected to multiple punishments" (emphasis and internal quotation marks omitted)); *United States v. Leftenant*, 341 F.3d 338, 348 (4th Cir. 2003) (where defendant convicted of six counts of possession instead of one, "the appropriate remedy is to vacate all of the convictions but one." (quoting *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993)); *United States v. Washington*, 1999 WL 668130, at *1 (4th Cir. 1999) ("We find that the district court did not abuse its discretion in denying Washington's pretrial motion to dismiss. As the court noted, there was a possibility that certain of the counts would not be multiplicitous if the Government could show that Washington possessed the firearms on different occasions.").

Defendants' multiplicity argument is meritless, but even if it were well-taken, the appropriate remedy would only come after trial.

## V.     Defendants' motion to dismiss Counts 5, 6, and 8 (Dkt 69, 70) should be denied.

Defendants have filed a motion to dismiss the honest-services wire-fraud charges (Counts 5, 6, and 8) from the indictment,[6] alleging that the interstate wires underlying these counts are merely "predicated on the banks electronic check-clearing activity" occurring "after Porter had already received the fruits of the alleged bribe payments" by cashing the checks. (Dkt 71 at 1.) As a result, defendants claim, the wire "transmissions were not made for the purpose of executing the scheme alleged in the indictment as required by the wire fraud statute," and the counts should be dismissed. (*Id.*)

Defendants' motion should be denied for at least three reasons. *First*, the motion is premised on the assumption that, at trial, the evidence will show that "the wire transmissions described in Counts 5, 6, and 8 relate to actions taken by the banks to clear the checks *after* Porter cashed them." (*Id.* at 4 (emphasis added).) Even if defendants' assumption is accurate, defendants' argument necessarily turns on a question of what the government's evidence will show at trial. As such, defendants' objection would more properly be presented in a Rule 29 motion for acquittal after the government has offered its proof at trial, and defendant's pretrial motion should be denied as premature.

*Second*, even assuming that defendants are correct that the wires occurred only after Porter received the cash, and even assuming that defendants should be permitted to raise such an argument in a pretrial motion to dismiss, defendants are incorrect to contend that the wires were not made "for the purpose of executing" the scheme. To the contrary, given that the bribe

---

[6] Defendants filed two identical motions to dismiss, at docket entries 69 and 70. One of these entries appears to have been an inadvertent duplicate. Defendants filed one memorandum in support (*see* docket entry 72) of the motion filed at docket entry 70.

payments from MPSC to Porter were a central part of the scheme alleged here, the actual transfer of the bribery funds from defendants' MPSC account, therefore, was not merely "post-fraud accounting among the potential victims," but rather was "incident to an essential part of the scheme" and "part of the execution of the scheme." *Schmuck v. United States*, 489 U.S. 705, 711, 715 (1989) (internal quotation marks omitted).

*Third*, even if the Court concludes that the individual wires were not incident to Porter's cashing of each of the three checks at issue, defendants' scheme was not "complete" after each individual check had been cashed. Rather, this was an "ongoing fraudulent venture" to which the wires were essential because Porter would not likely have been able to cash repeated checks from MPSC if his previously cashed checks had not cleared.

## A.     Defendants' pretrial motion to dismiss Counts 5, 6, and 8 for lack of evidence is premature.

Defendants' motion to dismiss is premised on an assumption about what they believe the government's proof will be at trial. As defendants note, the indictment alleges three interstate "wire transmissions relating to Porter's cashing of the checks he received from MPSC": a transmission from Fairfax, Virginia to New Jersey on July 23, 2014 (Count 5); a transmission from Fairfax, Virginia to New Jersey on August 19, 2014 (Count 6); and a transmission from Reston, Virginia to New Jersey on September 10, 2014 (Count 8). According to defendants, "[i]t appears that the wire transmissions described in Counts 5, 6 and 8 relate to actions taken by the banks to clear the checks *after* Porter cashed them." (Dkt 71 at 4 (emphasis added).)

This assumption that the wires occurred after Porter cashed the checks is not based on any allegations contained on the face of the indictment. What facts the government will succeed in proving at trial, of course, remains to be seen. But the fact that defendants' motion turns on an

argument over what the government will or will not prove at trial makes clear that it is not a proper pretrial motion to dismiss under Rule 12.

The Supreme Court has long rejected "a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. . . . In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial." *Costello v. United States*, 350 U.S. 359, 364 (1956). Likewise in *United States v. Engle*, 676 F.3d 405 (4th Cir. 2012), the court of appeals noted that, because defendant "moved under Rule 12 to dismiss Count 1 before trial, his motion was a challenge to the sufficiency of the indictment, which is ordinarily limited to the allegations contained in the indictment. A district court may dismiss an indictment under Rule 12 "where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *Id.* at 415 (citation omitted).

District courts in this district and this circuit have recognized this same rule. *See, e.g.*, *United States v. Shibin*, No. 11-0033, 2012 WL 8231152, at *4 (E.D. Va. Apr. 16, 2012) (Doumar, J.) *aff'd*, 722 F.3d 233 (4th Cir. 2013) ("[I]nsofar as it relies on facts outside of the indictment, Defendant's motion to dismiss fails . . . . On these issues, the government is entitled to introduce its evidence at trial and have it tested by a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29." (internal quotation marks omitted)); *United States v. Jefferson*, 562 F. Supp. 2d 687, 693 & n.12 (E.D. Va. 2008) (Ellis, J.) ("Whether or not the government is able to prove each of these elements with regard to each of the alleged acts in Counts 3 and 4 is a question properly addressed at trial, not on a motion to dismiss the

Indictment."); *United States v. Vaughn*, No. 08-0266, 2010 WL 597513, at *6 (S.D.W. Va. Feb. 16, 2010) ("Motions to dismiss based mainly upon questions of fact are not capable of determination prior to trial."); *United States v. Bridges*, No. 12-0022, 2013 WL 3989144, at *2 (W.D. Va. Aug. 2, 2013) ("It is settled that the sufficiency of the government's evidence in support of an indictment is not generally reviewable by the court prior to trial.").

The rule that defendants may not challenge the sufficiency of the government's evidence through a motion to dismiss the indictment applies with equal force here. Defendants' argument depends on an assumption about what the trial evidence will show about the timing of the wire transmissions at issue. The Court cannot evaluate this argument until the trial evidence is in. Defendants' motion to dismiss should therefore be denied as premature.

**B.      Even if the wires at issue were sent after Porter cashed the checks, they were still "incident to" and "part of the execution of the scheme as conceived" by the defendants, and thus may be the basis for wire-fraud convictions.**

As noted above, defendants contend that "[b]ecause each bank transmission was made after Porter had already received the fruits of the alleged bribe payment, the transmissions were not made for the purpose of executing the scheme alleged in the indictment as required by the wire fraud statute." (Dkt 71 at 1.) Defendants are incorrect. As the Supreme Court has made clear, the "relevant question at all times" is whether a wire[7] "is part of the execution of the scheme as conceived by the perpetrator at the time," *Schmuck*, 489 U.S. at 715, not whether the defendant, prior to the wiring "had obtained all the money [he] expected to get," *Sampson*, 371 U.S. at 79. As the indictment alleges, it was part of the purpose of the scheme that defendants

---

[7] Several of the cases discussed in this section involved mail fraud under 18 U.S.C. § 1341 rather than wire fraud under § 1343. As defendants note in their motion to dismiss, "the two statutes are generally interpreted in parallel." (Dkt 71 at 5 n.2.) *See also, e.g.*, *United States v. Jacobson*, 4 F.3d 987 (4th Cir. 1993) ("[C]ases construing the mail fraud statute are applicable to the wire fraud statute as well."); *Carpenter v. United States*, 484 U.S. 19, 25 n. 6 (1987). Consistent with this precedent, the government applies mail-fraud cases as if they involved wire fraud.

would "give things of value to Porter" in exchange for his influence in awarding NGB contract to MPSC. Considering that payment to Porter was an explicit part of the scheme, defendants cannot credibly claim that the wires transmitted by the bank incident to the payment they made to Porter were not made "for the purpose of executing" the scheme.

In support of their argument, defendants rely primarily on *Kann v. United States*, 323 U.S. 88 (1944). In *Kann*, the defendants devised a scheme to defraud their employer by diverting some of its profits into a side company they created and then by "distributing such profits through salaries, dividends, and bonuses." *Id.* at 89–90. After one of the defendants cashed a fraudulently procured check, the bank at which the check was cashed sought reimbursement by mailing the check to the bank that had issued the check. The Court held that this mailing was not "for the purpose of executing the scheme," finding that "[i]t was immaterial to [defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Id.* at 94. As the Court later characterized it, "[t]he checks [in *Kann*] were mailed for the banks' own purposes and not in any way for the furthering of the fraudulent scheme." *United States v. Sampson*, 371 U.S. 75, 79 (1962). "The intrabank mailings in *Kann* . . . involved little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Schmuck v. United States*, 489 U.S. 705, 714 (1989).

*Kann* recognized, however, that there are cases in which "use of the mails is a part of the execution of the fraud." 323 U.S. at 95. "In these the mailing has ordinarily had a much closer relation to further fraudulent conduct than the mere clearing of a check, although it is conceivable that this alone, in some settings, would be enough." *Id.* This is such a case. Defendants contend that "the wire transmissions at issue in Counts 5, 6, and 8 did *nothing more*

*than transfer funds from one bank to another* after the alleged bribe checks had been delivered and cashed." (Dkt 71 at 7 (emphasis added).) This characterization is simply not accurate. The wire transmissions at issue facilitated the transfer of the bribe payment amounts out of MPSC's account. Unlike in *Kann*, it certainly was *not* "immaterial" to these defendants whether and how the bank credited the checks issued to Porter. Paying Porter was essential to the scheme, and the wires were "incident to an essential part of the scheme' or 'a step in the plot.'" *Schmuck*, 489 U.S. at 710–11 (1989) (alterations and internal quotation marks omitted). The transfer of funds was necessary to complete the fraud because only then could defendants be assured that Porter was compensated. *United States v. Jinian*, 725 F.3d 954, 964 (9th Cir. 2013) ("Here, the mere clearing of a check is enough because the interstate communication was necessary to complete and conceal [defendant's] fraud. The wire transfer was necessary to complete the fraud because, until the checks cleared, [defendant] could not be certain it would be Bricsnet that would be swindled."). The scheme involved a bribe paid from MPSC to Porter, and that bribe could not be paid if money never came out of MPSC's account.

"The relevant question at all times is whether the [wire] is part of the execution of the scheme as conceived by the perpetrator at the time . . . ." *Schmuck*, 489 U.S. at 715. Defendants are alleged to have devised and executed a scheme to pay Porter a bribe with funds from MPSC's account. The bribe was certainly "essential" to the scheme (and defendants do not contend otherwise). A wire facilitating the transfer of the bribery funds from defendants' MPSC account, therefore, is not merely "post-fraud accounting among the potential victims," but rather is "incident to an essential part of the scheme" and "part of the execution of the scheme."

   C.   **Because the bribes here involved a series of payments and the success of future payments depended on the successful wire transmissions, the wires transmissions were made with the purpose of executing an ongoing fraudulent venture.**

42

Even if the Court were to conclude that the individual wire transfers charged in Counts 5, 6, and 8 were not "incident to" and "part of the execution of the scheme" of each cashed check, the wire transmissions (or at least those charged in Counts 5 and 6) still support charges under § 1343 because they were made for the purpose of executing "an ongoing fraudulent venture"— namely, the continued bribe payout to Porter on a series of checks. That scheme was not "complete" upon the cashing of each individual check, and its continued success depended on the smooth clearance of the prior checks.

The Supreme Court has noted that the presence of an "ongoing fraudulent venture" can clarify whether a wire transmission is made "for the purpose of executing" the scheme. In *Schmuck*, the defendant sold numerous used cars to unwitting car dealers after fraudulently rolling back their odometers. 489 U.S. at 707. The dealers then "would submit a title-application form" to the state regulatory agency before reselling the cars to retail customers. *Id.* The Court upheld Schmuck's mail-fraud convictions based on the mailings of these title-application forms because the scheme "was not a 'one-shot' operation," but rather "an ongoing fraudulent venture" that "would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him." *Id.* at 711–12. "[A]lthough the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." 489 U.S. at 12.

In the years since *Schmuck*, other courts of appeals have thus similarly concluded that even the "mere clearing of a check" can be made "for the purpose of executing" a scheme where the clearance is necessary for the scheme to continue. *See, e.g.*, *United States v. Jinian*, 725 F.3d 954, 962 (9th Cir. 2013) (noting, in light of "evidence that [defendant] deposited nearly 100

checks over the course of a two-year period," that defendant's "ability to perpetuate his scheme without interruption for two years was dependent upon the successful completion of the check clearing process for each . . . check [defendant] deposited"); *United States v. Mills*, 199 F.3d 184, 189–90 (5th Cir. 1999) (finding that "the mere clearing of a check" was "enough" where "success of the ongoing fraudulent venture depended upon continued harmonious relations among [defendant]'s personal banks[, the victim corporation, and other interstate banking entities]. Otherwise future fraudulent checks issued pursuant to the scheme would be dishonored and not credited to [defendant]'s accounts.").

So too here. The indictment alleges that MPSC did not pay the bribe to Porter in a lump sum but rather through three separate checks of about $10,000 each. (Dkt 2 at 16.) Defendants contend that "a problem clearing one of the checks would not have affected" defendant's intent to pay Porter. Maybe so. But a problem clearing the checks certainly would have affected defendants' ability to complete the scheme by jeopardizing Porter's ability to collect on the remaining checks. If, after Porter cashed the first check for $10,000, the bank was unable to redeem those funds from MPSC's account, the bank would have been unlikely to give Porter additional cash when he appeared with the second and third checks. For this reason, the successful wire transmissions were critical to the ongoing success of the scheme. Without the successful wire transmissions, the banks would have "lost faith" in the checks presented by Porter and future payments to Porter "would have come to an abrupt halt." The wires were "necessary" for the payment of the bribes, and payment of the bribes was "essential to the perpetuation"—and completion—of the scheme.

## VI.   Defendants' motion for a bill of particulars (Dkt 61) should be denied.

The defendants' motion for a bill of particulars should be denied because it is simply an attempt to learn the details of the government's trial strategy and to cabin the government in

advance of trial. Rule 7(f) of the Federal Rules of Criminal Procedure provides that "the court may direct the government to file a bill of particulars." The purpose of a bill of particulars is to inform a defendant of the charges against him so he may adequately prepare a defense, avoid or minimize surprise at trial, and plead in bar of another prosecution for the same offense. *Wong Tai v. United States*, 273 U.S. 77, 82–83 (1927); *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir.), *cert. denied*, 519 U.S. 857 (1996); *United States v. Automated Medical Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985); *United States v. Dulin*, 410 F.2d 363, 364 (4th Cir. 1969). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks omitted).

A bill of particulars is *not* a means of obtaining generalized discovery, a "detailed exposition of [the government's] evidence," or an explanation of "the legal theories upon which it intends to rely at trial." *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980); *see also United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973) ("Ordinarily, the function of a bill of particulars is not to provide detailed disclosure of the government's evidence in advance of trial but to supply any essential detail which may have been omitted from the indictment." (internal quotation marks omitted)). Defendants may not compel the government, through a bill of particulars, to specify the details of overt acts already set forth in the indictment, *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir. 1978); *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975); *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975), nor specify the precise manner in which the crimes charged in the indictment were committed, *United States v. Andrews*, 381 F.2d 377, 377–78 (2d Cir. 1967).

45

Consistent with the limited function of a bill of particulars, courts routinely deny requests for bills of particulars "when the information requested is provided to the defendant in some other form." *United States v. Marrero*, 904 F.2d 251, 258 (5th Cir. 1990); *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means."). "A defendant is not entitled to an unnecessary bill of particulars, where the underlying objectives of a Rule 7 motion are fully satisfied by informal and formal discovery." *United States v. Ahmad*, No. 14-164, 2014 WL 2766121, at *8 (E.D. Va. June 18, 2014) (internal quotation marks and alterations omitted); *see also United States v. Soc'y of Indep. Gasoline Marketers of Am.*, 624 F.2d 461, 466 (4th Cir. 1980) (finding denial of bill of particulars not improper in light of discovery provided by the government).

In the instant case, the detailed indictment handed down in July of last year sets forth the elements of the charged offenses, identifies the times and places of the defendants' criminal conduct, and cites the statutes violated by that conduct. The indictment goes on to name the specific contracts that are part of their corrupt agreement. It also provides details of specific recorded meetings and even detailed quotes from those meetings. This information provides the defendants with sufficient notice of the charges to enable them to prepare their defense. *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008). As set forth above, the defendants may not use a bill of particulars as a discovery tool to elicit further factual specifics supporting these charges, or probe the government's legal theories.

Furthermore, the government has already disclosed to the defense a detailed description of the facts and circumstances surrounding the alleged offenses. The government has produced numerous items, including, among other things: law enforcement investigative reports,

recordings, bank documents, and emails (pertaining to both the charged crimes and other criminal activities involving the defendants). The government has also provided the defense with recordings of conversations between them and a cooperating witness in which the defendants and their role in the charged crimes is made clear. Moreover, the government has specified within the indictment numerous quotations from recordings which describe defendants' scheme and highlight their roles within it.

The defendants have also requested that the government identify all co-conspirators. It is well-settled that the government is not required to identify the names of unindicted co-conspirators. *United States v. Paiva*, 892 F.2d 148, 155 (1st Cir. 1989); *United States v. Torres*, 901 F.2d 205, 233–34 (2d Cir. 1990); *Wilkins v. United States*, 376 F.2d 552, 562–63 (5th Cir. 1967); *United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991); *United States v. DiCesare*, 765 F.2d 890, 897–98 (9th Cir.), *amended on other grounds,* 777 F.2d 543 (9th Cir. 1985); *United States v. Davis*, 679 F.2d 845, 851 (11th Cir. 1982) (it is the conspiracy agreement rather than identity of those agreeing that is the essential elements of the offense); *see also United States v. Gotti*, 784 F. Supp 1017, 1017–19 (E.D.N.Y. 1992) (defendant not entitled to this information either through bill of particulars or as discovery); *United States v. Lobue*, 751 F. Supp. 748, 756 (N.D. Ill. 1990) (defendants do not need names of unindicted persons to understand the charges against them).

A defendant may be indicted and convicted with the names of his co-conspirators remaining unknown, so long as the government's evidence establishes an agreement between two or more persons, which is the prerequisite to obtaining a conspiracy conviction. *Rey*, 923 F.2d at 1222 (*citing Rogers v. United States*, 340 U.S. 367, 375 (1951) and *United States v. Piccolo*, 723 F.2d 1234, 1238–39 (6th Cir. 1983)); *see also United States v. Stitt*, 250 F.3d 878,

47

887–88 (4th Cir. 2001) (under conspiracy law at least two persons required to constitute the conspiracy but a defendant can be convicted of conspiring with persons whose names are unknown); *United States v. Nason*, 9 F.3d 155, 159 (1st Cir. 1993) (same). "It is the grand jury's statement of the 'existence of the conspiracy agreement rather than the identity of those who agree' which places the defendant on notice of the charge he must be prepared to meet." *Rey*, 923 F.2d at 1222 (*citing Piccolo*, 723 F.2d at 1239, *quoting United States v. Davis*, 679 F.2d 845, 851 (11th Cir. 1982)).

Here, defendants understand the charges at hand in order to defend themselves and are not entitled to a list of witnesses that the government intends to call at trial. At this time, however, the government does not intend to present evidence from additional co-conspirators involved in the scheme to bribe Porter alleged in the indictment. The government does expect to present evidence of other bribery schemes involving the defendants and will notice that evidence in accordance with the discovery order.

Defendants have asked the Court to strike from the indictment the reference to "others" when referring to other co-conspirators as surplusage. Rule 7(d) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." The purpose of the rule is "to protect a defendant against inflammatory or prejudicial allegations that are neither relevant nor material to the charges." *United States v. Moussaoui*, No. 01-0455, 2003 WL 1877700, at *1 (E.D. Va. Feb. 28, 2003) (citing *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979)). "[A] motion to strike surplusage from the indictment should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006); *see also United States v. Allegheny Bottling Co.*, No. 87-0123, 1988 WL 32936, at *3

(E.D. Va. Feb. 10, 1988) ("[I]t is clearly established that the mere presence of surplusage in an indictment, absent prejudice, need not be stricken.") (citing *Ford v. United States*, 273 U.S. 593 (1927)). This standard is "rather exacting, and only rarely has surplusage been ordered stricken." 1 Charles Alan Wright, Federal Practice & Procedure § 127, at 635–339 (3d ed. 1999). Here, references to "others" are hardly inflammatory or prejudicial and the references to "others" should not be struck from this part of the indictment.

Remarkably, and despite the extensive discovery provided in this case and the specific factual allegations set forth in the indictment, one of the reasons given by defendants for seeking a bill of particulars is to "Understand Several Allegations in the Indictment Concerning Essential Matters." (Dkt 62 at 6.) In making this request, defendants mistake the fundamental purpose of a bill of particulars: to ensure the government has informed the defendants *of the charges against them*. It does not require the government to divulge to the defendant specific details regarding all of the defendant's conduct in furtherance of the purposes, means, or methods of the underlying conspiracy. Here, even though the discovery is voluminous, the case is a straightforward one involving a simple particular bribery scheme captured on video.[8]

---

[8] Nor is there merit to defendants' contention that the "enormous size" of the government production "alone" warrants a bill of particulars. As the government has already noted, in prior briefing, it has been fair in producing discovery in this case. First, the government produced documents that are most relevant both to the government's case—as well as what the government believed to be relevant to the defense—on July 17, 2015, two days after the defendants were indicted. The defendants were advised that there was a large amount of additional material as part of the broader investigation and requested to be provided with all of it. The government processed, tagged, and indexed this large amount of material in order to assist the defendants in locating and searching material in preparation for their defense. The government has provided additional metadata requested by the defendants, has participated in multiple conference calls with defense counsel and technical personnel, and held an in-person meeting with the government's litigation support staff and defense in order to assist the defendants in locating materials in the discovery provided. Under these circumstances, defendants are incorrect to claim that amount of discovery requires a bill of particulars. *See, e.g.*, *United States v. Nicolo*, 523 F. Supp. 2d 303, 316 (W.D.N.Y. 2007) *aff'd*, 421 F. App'x 57 (2d

In making their request for a Bill of Particulars, the defendants have made six specific requests for clarifying information that the government will address in turn.

(1) The first request is for the exact date of the beginning of the conspiracy. The government alleged that it began "In or about 2010 or 2011." The defendants suggest, without citing any authority, that the government must provide a precise date or location about when the conspiracy was formed. With respect to the charge of conspiracy, the general rule is that the defendant is not entitled to obtain "detailed information about the conspiracy in a bill of particulars." *United States v. Diaz*, 303 F. Supp. 2d 84, 89 (D. Conn. 2004); *see also United States v. Murgas*, 967 F.Supp. 695, 702 (N.D.N.Y. 1997). Indeed, the government need not state the particulars as to the formation of, entrance into, length of membership in, or withdrawal from, a conspiracy. *United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) (how and when conspiracy formed and entered into); *United States v. Boffa*, 513 F. Supp. 444, 485 (D. Del. 1980) ("nor is it necessary for the Government to disclose in a bill of particulars the precise details that a defendant and his alleged co-conspirators played in forming and executing a conspiracy or all the overt acts the Government will prove in establishing the conspiracy");

Cir. 2011) (rejecting request for a bill of particulars and noting that "the mere fact that voluminous discovery has been provided is not enough by itself to require a bill of particulars," especially where "[t]he indictment contains a wealth of detail, and is anything but "bare bones"; it describes with specificity the numerous particular transactions that form the basis of the charges against defendants"); *United States v. Martinez*, No. 06-0045, 2008 WL 394959, at *3–4 (D.N.D. Feb. 12, 2008) (denying request for bill of particulars despite defendant's claim "that he needs a bill of particulars because of the difficulties he has encountered in reviewing the voluminous discovery materials in this case" where, upon reviewing the indictment, the court obtained "a clear picture of the charges against Defendant and the alleged acts involved in those charges" such that "Defendant has been informed of the nature of the charges against him with sufficient particularity to enable him to prepare for trial"); *United States v. Guerrerio*, 670 F. Supp. 1215, 1224 (S.D.N.Y. 1987) (denying request for bill of particulars despite defendants' "protest that the government has not offered any guidance in interpreting or characterizing the vast number of documents produced" and noting that there is "no requirement that the government allow the defendants a preview of the government's evidence or the theory of its case").

*United States v. Ostrer*, 481 F. Supp.407, 417 (S.D.N.Y. 1979) ("The request for specific dates on which each defendant and co-conspirator joined the conspiracy is denied. It is clear from the case law that the government is not required to furnish such information."); *United States v. Greater Syracuse Bd. of Realtors*, 438 F. Supp. 376, 381 (N.D.N.Y. 1977) (date of withdrawal from conspiracy); *United States v. Turner*, 274 F. Supp. 412, 418 (E.D. Tenn. 1967) (requests for a bill of particulars "as to the formation of the conspiracy have uniformly been denied"); *United States v. Kahaner*, 203 F. Supp. 78, 84 (S.D.N.Y. 1962) (such requests are "almost uniformly . . . denied").

As one United States District Court Judge has stated: "To the extent the motion seeks particulars with respect to the time, date, places, and acts through which [the defendant] allegedly joined and participated in the conspiracy, and the witnesses present, it improperly seeks evidentiary detail." *United States v. Aguilar*, 2011 WL 1869388, at *2 (D. Nev. 2011)(citing *United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979) ("request for the 'when, where, and how' of every act in furtherance of the conspiracy was equivalent to a request for complete discovery of the government's evidence, which is not a purpose of the bill of particulars")); *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (motions for "whens," "wheres," and "with whoms" regarding a conspiracy are routinely denied). "The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *United States v. Kendall*, 665 F.2d 126, 135 (9th Cir. 1981) (citing *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980)).

Here, the government has provided defendants with the reports describing the formation of the conspiracy and has provided subsequent recorded conversations where the conspiracy was discussed in its July 17, 2014 initial production. Defendants also know what contracts were

involved in the bribery scheme. Defendants are not entitled to have the government preview the entire case, nor is it required that the government tell defendants what it intends to say at trial.

(2) The second request made by defendants is for a clarification of what the term "at least" means with respect to the indictment. Here, this language is entirely appropriate and they know exactly what the contracts are. The contracts that the defendants secured through their bribery scheme with Porter that are alleged in the indictment were worth approximately $55,000,000, which is what was discussed during the recorded board of directors meeting. However, like many contracts, these contracts had option years for extensions which would make their overall value greater to MPSC.

(3) Although not required as discussed above, the government does not take issue with striking the word "and others" from paragraph 20 of the indictment.

(4) The defendants again take issue with not having a precise date for the beginning of the conspiracy charged in the indictment. Again, the defendants have been provided detailed reports describing when the conspiracy began. They also take issue with the term "at least" again. The term "at least" has its usual meaning in the indictment because the government can prove that the conspiracy was continuing until at least September of 2014 when MPSC was searched.

(5) Defendants have requested information about the National Guard contracting process and Robert Porter's role in it. The defendants have been provided 302s describing his role in the National Guard Bureau. Additionally, each of the defendants is a retired National Guard official and intimately familiar with the contracting process and Mr. Porter's role in it by virtue of their past positions and the fact that MPSC did millions of dollars of business with the National Guard Bureau.

(6) Defendants have also requested information about items provided to Porter. Again, the government has provided several reports of interviews with Mr. Porter that describe these payments.

In light of the extensive discovery provided in this case, including the fact that much of the facts requested in defendants' motion were provided in the July 17, 2015 more limited production, and because of the detailed indictment, there will be no unfair surprise and defendants can more than adequately prepare their defense. A bill of particulars is therefore inappropriate, and the Court should deny defendants' motions.

## VII.  Defendants' motion to compel production of interview notes (Dkt 65) should be denied.

Defendants have filed a motion seeking "an order compelling the government to produce all rough notes of interviews conducted by federal law enforcement personnel that correspond to reports produced to defendants by the government." (Dkt 66 at 1.) Although defendants are not entitled to interview notes where they have been provided summary reports of those same interviews, the government will produce the interview notes in this case.

Rule 16 of the Federal Rules of Criminal Procedure does not authorize the discovery of documents made by government agents in connection with the investigation or prosecution of a case. Fed. R. Crim. P. 16(a)(2); *see United States v. Perry*, No. 13-0156, 2014 WL 3955232, at * 3 (E.D.V.A. Aug. 1, 2014) (holding that under Rule 16(a)(2), the Government has no obligation to produce copies of, or even provide access to, agents' notes).

Pursuant to the government's *Brady* obligations, the government is required to provide exculpatory material evidence that could affect the result of the proceeding. *See Brady v. Maryland*, 373 U.S. 83 (1963). However, if the government has produced a report that provides that information, it is not necessary that the government produce the interview notes that served

as the basis of that report. *See United States v. Bran*, 950 F. Supp. 2d 863, 869 (E.D.V.A. June 11, 2013) (holding that there cannot be a Brady violation when the evidence is available through other sources); *see also United States v. Clark*, 851 F.2d 356 (4th Cir. 1988) (holding that the government's decision not to produce an agent's notes that were essentially duplications of evidence already available to defendants prior to trial did not constitute a *Brady* violation).

The Jencks Act gives defendants the "right to examine and use, following the direct examination of a government witness, any statement of that witness which is in the possession of the United States and relates to the subject matter as to which the witness has testified." *United States v. Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994) (internal quotations omitted) (quoting 18 U.S.C. § 3500(b)). An agent's notes of an interview only fall within the Jencks Act ambit when (1) the witness reviewed the notes in the entirety and (2) the witness formally and unambiguously approves the notes as an accurate record of what she or he said during the interview. *Id.*; *see also United States v. Ware*, 225 F.3d 656 (4th Cir. 2000) (holding an agent's notes were not Jencks material because there was no evidence the witness ever reviewed or adopted the agent's notes); *United States v. Hinton*, 719 F.2d 711, 717–18 (4th Cir. 1983) (stating that rough notes made by a government agent during an investigation that are not intended as a final report and serve only a limited and temporary purpose do not qualify as Jencks material).

Here, the interview notes that defendants seek were notes taken during interviews of witnesses, which law enforcement later provided those same facts in formal reports. Although the formal reports have been provided to defendants, they now seek the rough interview notes that served as the basis of those reports. Because the facts and evidence contained within the

54

interview notes have already been provided in formal interview reports, the government is not obligated to provide these notes under its Rule 16, *Brady*, or Jencks obligations.

However, in this case—and without waiving future arguments to do the contrary—the government will provide defendants with the interview notes. Thus, defendants' Motion to Compel Production of All Interview Notes should be denied as moot.

## VIII.   Defendants' motion to compel defendants' statements (Dkt 67) should be denied.

Defendants have filed a separate motion seeking "an order compelling the government to produce all portions of all written records containing discoverable statements made by defendants during encounters with federal law enforcement officers." (Dkt 68 at 1.) As discussed above, although defendants are not entitled to interview notes where they have been provided summary reports of those same interviews, the government will produce the interview notes from the interviews of the defendants in this case.

Again, and as noted above, Rule 16 of the Federal Rules of Criminal Procedure does not authorize the discovery of documents made by government agents in connection with the investigation or prosecution of a case. Fed. R. Crim. P. 16(a)(2); *see United States v. Perry*, No. 2:13cr156, 2014 WL 3955232, at * 3 (E.D.V.A. Aug. 1, 2014) (holding that under Rule 16(a)(2), the government has no obligation to produce copies of, or even provide access to, agents' notes). Further, the Fourth Circuit has held that the government is not obligated to produce interview notes of a law enforcement agent from an interview of a defendant where the government has produced a report of that same interview. *See United States v. Smith*, 117 Fed. Appx. 256 (4th Cir. 2004).

However, in this case—and without waiving future arguments to do the contrary—the government will provide the Defendants with the interview notes from their interviews. Thus,

defendants' Motion to Compel Records of Statements Under Fed. R. Crim. 16(a)(1)(B)(ii) should be denied as moot.

## IX.    Defendants' motion for discovery order (Dkt 74) should be granted in part and denied in part.

At the November 20, 2015, hearing on the defendants' motion to compel, the Court asked that the parties provide additional filings in regard to a proposed discovery order. The Defendants filed the instant Motion for Entry of a Discovery Order. (*See* Dkt 74). Meanwhile, the government filed a supplemental response to the Defendants' original Motion to Compel. (*See* Dkt 79).

As noted above and as stated in the government's response to the defendants' motion to compel and the government's supplemental response, the government has been fair in producing discovery in this case. First, the government produced documents that are most relevant both to the government's case—as well as what the government believed to be relevant to the defense—on July 17, 2015, two days after the defendants were indicted. The defendants were advised that there was a large amount of additional material as part of the broader investigation and requested to be provided with all of it. The government processed, tagged, and indexed this large amount of material in order to assist the defendants in locating and searching material in preparation for their defense. The government has provided additional metadata requested by the defendants, has participated in multiple conference calls with defense counsel and technical personnel, and held an in-person meeting with the government's litigation support staff and defense in order to assist the defendants in locating materials in the discovery provided.

In this supplemental filing, the government provided a new proposed discovery order that amends the standard discovery order such that the government will provide advanced notice of

evidence that the government intends to provide at trial pursuant to Federal Rule of Evidence 404(b) on February 15, 2016.

For the reasons stated in the government's response to the defendants' motion to compel (*See* Dkt 56) and in the government's supplemental response (*See* Dkt 79), the government requests that the Court enter the proposed discovery order provided by the government in its supplemental response. Thus, the Defendants' Motion for Entry of Discovery Order should be granted in part, and denied in part.

<u>**CONCLUSION**</u>

As discussed above, the government believes that each and every one of defendants' pretrial motions should be denied. The government does not believe that an evidentiary hearing is required on any of the motions save possibly one: relating to defendant Ross DeBlois's motion for sanctions regarding an alleged written statement he provided to federal agents (Dkt 72), the government welcomes an evidentiary hearing concerning the events that occurred during agents' September 30, 2014 interview of DeBlois.

Date: January 19, 2016                     Respectfully submitted,


Dana J. Boente                             Andrew Weissmann
United States Attorney                     Chief, Fraud Section
                                           Criminal Division


By: _____/s/_____                      By: _____/s/_____
    Jonathan L. Fahey                          Alison L. Anderson
    Christopher Catizone                        Trial Attorney
    Assistant United States                    Fraud Section
    Attorneys                                   Criminal Division
    Eastern District of Virginia               U.S. Department of Justice

    The Justin W. Williams                      The Bond Building
        U.S. Attorney's Building                1400 New York Ave NW
    2100 Jamieson Avenue                        Washington, DC 20530
    Alexandria, VA 22314                        Phone: (202) 598-2929
    Phone:        (703) 299-3700               Fax: (202) 514-0152
    Fax:          (703) 299-3980               alison.anderson@usdoj.gov
    jonathan.fahey@usdoj.gov
    christopher.catizone@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of January, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

Date: January 19, 2016                              Respectfully submitted,

                                                    Dana J. Boente
                                                    United States Attorney

By:                                    _____/s/_____
                                                    Christopher Catizone
                                                    Assistant United States Attorneys
                                                    Eastern District of Virginia

                                                    The Justin W. Williams
                                                        U.S. Attorney's Building
                                                    2100 Jamieson Avenue
                                                    Alexandria, VA 22314
                                                    Phone:          (703) 299-3700
                                                    Fax:            (703) 299-3980
                                                    christopher.catizone@usdoj.gov